Entered on Docket
September 08, 2015
EDWARD J. EMMONS, CLERK
U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

The following constitutes
the order of the court. Signed September 8, 2015

M. Elaine Hammond
U.S. Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br><br>Kenneth Keun Sung Lee and<br><br>Hyun Joo Lee,<br><br>                Debtor(s). | Case No. 13-55559 MEH<br><br>Chapter 7 |
| Undon Paik,<br><br>                Plaintiff.<br><br>v.<br><br>Kenneth Keun Sung Lee and<br><br>Hyun Joo Lee,<br><br>                Defendants. | Adv. No. 14-5009<br><br>Trial<br>Date:     July 21, 2015 and<br>            July 22, 2015<br>Time:    9:00 a.m.<br>Ctrm:    3020 |

## MEMORANDUM DECISION

A trial was held July 21 and 22, 2015 in the above-captioned adversary case. Paik requests the court deny the Lees' chapter 7 discharge and deem the Lees' debts to Paik nondischargeable. John Mejia appeared on behalf of Paik and David Smyth appeared on behalf of Kenneth Keun Sung Lee and Hyun Joo Lee (referred to herein as "Lee" and "Hyun Lee" respectively).

This court has jurisdiction over the adversary proceeding pursuant to 28 U.S.C. § 1334 and General Order No. 24 of the United States District Court for the Northern District of California. This is a core proceeding pursuant to 28 U.S.C. § 157 (b)(2)(I) and (J).

Background

Paik, among many others, is the victim of a Ponzi scheme carried out by SNC Investments, Inc. and SNC Asset Management, Inc. (together, "SNC"). SNC promised high returns on investments in international over-the-counter foreign currency markets ("Forex"), but in reality it was a Ponzi scheme that converted investors' funds for other purposes until it closed operations in 2008. Paik invested a total of $615,777.47 between April 2005 and April 2006.

Paik met Lee in the early 1990's. Lee was a customer at Paik's sushi restaurant and would make monthly visits to the restaurant from 1998 to 2001. From 2002 to 2005, he would visit the restaurant approximately six times a year. During his visits, Lee would discuss his investments in SNC with Paik, in particular his profits and the ongoing success of the business.

Prior to the bankruptcy filing, Lee settled with Paik in a state court action for $120,000.00. The parties agreed to entry of a stipulated judgment of $165,000.00 in the event that Lee failed to make payments pursuant to the settlement agreement. Lee did not ultimately make any payments. The Lees filed the underlying chapter 7 case on October 21, 2013 and Paik initiated this adversary proceeding on January 27, 2014. Paik seeks to have the court deem the Lees' debt nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A)[1], (a)(2)(B)

---

[1] Unless specified otherwise, all chapter, code and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, and the Federal Rules of Bankruptcy Procedure, Rules 1001–9037.

and (a)(19), and to have the court deny the Lees' discharge pursuant to §§ 727(a)(3) and (a)(4)(A).[2]

Discussion

**1. Nondischargeability under 11 U.S.C. § 523(a)(2)(A)**

To prevail on a claim under § 523(a)(2)(A), a creditor must demonstrate five elements; (1) misrepresentation, fraudulent omission or deceptive conduct by the debtor; (2) knowledge of the falsity or deceptiveness of his statement or conduct; (3) an intent to deceive; (4) justifiable reliance by the creditor on the debtor's statement or conduct; and (5) damage to the creditor proximately caused by its reliance on the debtor's statement or conduct. *Deitz v. Ford (In re Deitz)*, 760 F.3d 1038, 1050 (9th Cir. 2014). The creditor bears the burden of proof to establish all five of these elements by a preponderance of the evidence. *Id.*

A § 523(a)(2)(A) claim may arise from the concealment or intentional non-disclosure of material facts. *Loomas v. Evans (In re Evans)*, 181 B.R. 508, 515 n.6 (Bankr. S.D.Cal. 1995). A debtor's knowledge and intent to deceive may be inferred by circumstantial evidence and from the debtor's conduct. *Edelson v. Comm'r of Internal Revenue*, 829 F.2d 828, 832 (9th Cir. 1987); *Donaldson v. Hayes (In re Hayes)*, 315 B.R. 579, 587 (Bankr. C.D.Cal. 2004). The alleged misrepresentation must have occurred at the inception of the debt as an inducement for the debt. *See New Falls Corp. v. Boyajian (In re Boyajian)*, 367 B.R. 138, 147 (B.A.P. 9th Cir. 2007). Paik must prove his non-dischargeability claim for relief by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991).

A debtor's knowledge and intent to deceive may be inferred from the totality of the circumstances. *Gertsch v. Johnson & Johnson, Fin. Corp. (In re Gertsch)*, 237 B.R. 160, 167-68 (B.A.P. 9th Cir. 1999). When determining the knowledge element, "[a] representation

---

[2] Paik's pre-trial brief asserts a claim for relief pursuant to 11 U.S.C. § 523(a)(6). This claim is not included in Paik's Closing Argument after Trial, docket # 35. Based on its omission, the court determines that relief is no longer requested pursuant to § 523(a)(6).

may be fraudulent, without knowledge of its falsity, if a person making it is conscious that he has merely a belief in its existence and recognizes that there is a chance, more or less great, that the fact may not be as it is represented." *Gertsch*, 237 B.R. at 168 (internal quotation omitted); *see also Houtman v. Mann (In re Houtman)*, 568 F.2d 651, 656 (9th Cir. 1978) ("Reckless indifference to the actual facts, without examining the available source of knowledge which lay at hand, and with no reasonable ground to believe that it was in fact correct is sufficient to establish the knowledge element."). The court may find intent to deceive "where there has been a pattern of falsity or from a debtor's reckless indifference to or disregard of the truth." *Khalil v. Developers Sur. & Indem. Co. (In re Khalil)*, 379 B.R. 163, 174-75 (B.A.P. 9th Cir. 2007).

Whether reliance is justified depends upon the "qualities and characteristics of a particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." *Field v. Mans*, 516 U.S. 59, 71 (1995).

It is uncontested that Lee visited Paik at his restaurant numerous times between 1998 and 2005, when Paik made his initial investment in SNC.[3] Lee admits that he discussed with Paik his successful investments in SNC, that investing in SNC was a golden opportunity, that he was a director and owner of the company, and that he thought the company was very well-managed based on the returns. Lee disputes that he recommended for Paik to invest in SNC, but he admits to inviting others to invest and that he was the director of marketing for SNC. The court does not find credible Lee's testimony that he never told Paik he should invest. Instead, the court finds Paik's testimony compelling that Lee told him he should invest, provided him with SNC brochures, informed him that SNC was a safe investment, and promised that if Paik invested he would receive a return of 3%, that when compounded would yield 36% interest per year. Further, Paik's testimony is consistent with the testimony of

---

[3] The parties stipulated that from 1998 through 2001, Lee visited Paik's restaurant approximately 1-2 times per month, and from 2002 through 2005, Ken Lee visited Paik's restaurant approximately 6 times a year.

Sooyeong Kwan, another investor in SNC. Thus, the court finds that Lee made misrepresentations about SNC to Paik to induce him to invest in SNC.

The issue then is whether Lee knew the misrepresentations were false when he made them. Lee asserts that he was hired because of his contacts, was not involved in SNC's operations and investing, and did not know SNC's operations were a Ponzi scheme. In determining whether Lee made a false representation, the court looks to whether he knowingly made a false representation or if he made a representation with "reckless indifference to the actual facts, without examining the available source of knowledge which lay at hand, and with no reasonable ground to believe that it was in fact correct." *See Houtman*, 568 F.2d at 656. It is undisputed that since 2003 or 2004 Lee was a 10% owner in SNC, he was its Marketing Director and also on its Board of Directors, and Lee dealt frequently with SNC's CEO, Peter Son, and CFO, Jin Chung. Lee further admits that he earned over $3 million in income from SNC in the last four years of SNC's existence.[4] He testified that when potential investors wanted more information related to the Forex trading, he would accompany them to SNC's offices in San Francisco for Son and Chung to answer their technical questions. Further, he states that Son and Chung only discussed new customer issues with him and that they appeared uninterested in Forex trading. Although he initially testified that he had no recollection of it, the evidence at trial established that Lee was a registered member of the National Futures Association. His membership was sponsored by SNC.

Lee's history of investments in SNC also raises questions. Lee invested $270,000 with SNC, or its predecessor Son and Company, between September 2001 and October 2003.[5] He made no further personal investments until his business, Cal-Tech,[6] provided SNC with

---

[4] This includes income paid directly to Lee from SNC, and income earned from SNC through Lee's solely-owned corporation, Cal-Tech International ("Cal-Tech").

[5] The $270,000 includes a $10,000 investment made in Hyun Lee's name but funded by a cashier's check obtained by Lee.

[6] Evidence was introduced to show that Cal-Tech provided additional investment funds of $420,000 in May 2003 and $230,000 in June 2003. The memo line on the checks state "Eun Suk Inc." Lee testified that Cal-Tech made these investments on behalf of a Korean company

$100,000 in January 2008 and another $100,000 in September 2008. Lee testified that he made the 2008 investments because Chung and Son informed him that SNC needed money. As it appears that Lee was receiving annual growth of 30% on his investments since 2003, it is unclear why he wasn't investing more between 2003 and 2008. Lee's only explanation was that he "didn't want to be greedy." The court finds this inconsistent with Lee's admitted marketing tactic of flaunting his own success, and contrary to Lee's demeanor during the trial.

Taken together, the court finds that based on Lee's lengthy involvement with SNC and its founders at a high level and his access and opportunity to learn about the business, Lee either knew about the fraudulent nature of the Ponzi scheme or was recklessly indifferent to the actual facts available to him about SNC. As such, the misrepresentations of Lee to Paik were knowingly made with an intent to deceive for the purposes of § 523(a)(2)(A).

Paik justifiably relied on Lee's numerous representations that investments in SNC were safe and profitable. The reliance is justifiable based on the consistent representations to Paik over an eight year period. Throughout this period Lee bragged about his success through SNC and the money earned by Lee and his friends through it.

Paik invested a total of $615,777.47 through three separate investments in SNC. These investments are supported by promissory notes issued by SNC on April 7, 2005, March 28, 2006, and April 12, 2006. The investments made, and lost, are Paik's damages. Paik argues in his closing brief that based upon promised rates of return he lost a total of $1,239,306.01. As the parties admit, little or none of the investors' money was traded. Thus, the purported interest income never existed. Consistent with cases seeking recovery from investors in other Ponzi schemes, Paik is not entitled to a nondischargeable claim greater than his investment amount. *See Donell v. Kowell*, 533 F.3d 762, 771-72 (9th Cir. 2008) (explaining the "netting rule" in recovery of fraudulent transfers related to Ponzi schemes). Further, the parties' agreed in their Joint Pre-trial Conference Statement that the appropriate

---

that was not able to invest directly. Cal-Tech also made an investment of $100,000 in July 2006. It is unclear whether this was made for the benefit of Lee or Eun Suk Inc.

measure of damages is the amount of money that the plaintiff lost that was caused by fraud and/or false statements made by Lee.

The Lees argue that any nondischargeability judgment should be reduced by the $300,000 that Mr. Paik received in settlements from co-obligors to the state court judgment. Under California law, the burden of proof is on the party asserting a right to setoff or reduction of damages – here, the Lees. *C.B. v. City of Sonora*, 769 F.3d 1005, 1032 (9th Cir. 2014); *Frankfort Marine Accident & Plate Glass Ins. Co. v. California Artistic Metal & Wire Co.*, 28 Cal. App. 74, 85-86 (Cal. Ct. App. 1915); 2 Cal. Affirmative Def. § 44:8 (2d ed.).

Defendant cites *Decker v. Tramiel (In re JTS Corp.)*, 617 F.3d 1102 (9th Cir. 2010), which in turn cites to Cal. Civ. Proc. Code § 877. That statute provides:

> Where a release, dismissal with or without prejudice, or a covenant not to sue or not to enforce judgment is given in good faith before verdict or judgment to one or more of a number of tortfeasors claimed to be liable for the same tort, or to one or more other co-obligors mutually subject to contribution rights, it shall have the following effect:
>
> (a) It shall not discharge any other such party from liability unless its terms so provide, but it shall reduce the claims against the others in the amount stipulated by the release, the dismissal or the covenant, or in the amount of the consideration paid for it, whichever is the greater … .

The purpose of this statute is to preclude a double recovery arising out of the same wrong. *JTS*, 617 F.3d at 1116 (citing *Vesey v. United States*, 626 F.2d 627, 633 (9th Cir. 1980)).

The court in *JTS* explained that individuals are joint tortfeasors under Cal. Civ. Proc. Code § 877 if they caused "one indivisible injury" or "the same wrong." *JTS*, 617 F.3d at 1116 (citing *May v. Miller*, 228 Cal. App. 3d 404, 409-10 (Cal. Ct. App. 1994); *Lafayette v. County of Los Angeles*, 162 Cal. App. 3d 547, 554 (Cal. Ct. App. 1984)).

The "same wrong" may emanate from two successive independent torts and does not require unity of purpose, action, or intent by the two or more tortfeasors. Also, the plaintiff need not allege the same tort against the tortfeasors, but must only claim that the tortfeasors caused the same harm. "Two tortfeasors can both be liable for the same tort without being joint tortfeasors in the sense of concert of action and unity of purpose." *Id.* at 1116-17 (citations omitted).

Paik testified that he recovered $200,000 of his investment from his CPA Andrew Jean and $100,000 from Byung Kang of SNC. The $300,000 he recovered represented funds he lost as a result of investing in SNC. A reduction is warranted to avoid double-recovery of those funds.

In light of the foregoing, Paik's § 523(a)(2)(A) claim is granted with respect to Ken Lee, with damages in the amount of $315,777.47 ($615,777.47 in stipulated investment reduced by $300,000 received in settlement).

**2. Nondischargeability under 11 U.S.C. § 523(a)(2)(B)**

For a debt to be excepted from discharge under § 523(a)(2)(B), it must be based on a writing that contains: "(1) a representation of fact by the debtor, (2) that was material, (3) that the debtor knew at the time to be false, (4) that the debtor made with the intention of deceiving the creditor, (5) upon which the creditor relied, (6) that the creditor's reliance was reasonable, [and] (7) that damage proximately resulted from the representation." *Candland v. Ins. Co. of N. Am. (In re Candland)*, 90 F.3d 1466, 1469 (9th Cir. 1996). As with § 523(a)(2)(A), knowledge and intent can be inferred from surrounding circumstances, including reckless disregard for the truth. *In re Gertsch*, 237 B.R. at 167-68. The creditor seeking an exception must prove these elements by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. at 291.

A misrepresentation must pertain to "the debtor's or an insider's financial condition" in order to satisfy the requirements of § 523(a)(2)(B). A corporation of which the debtor is a director, officer, or person in control qualifies as an "insider" of the debtor. 11 U.S.C.

§ 101(31)(A)(iv). Statements regarding a debtor's financial condition "are those that purport to present a picture of the debtor's [or insider's] overall financial health," i.e., "those analogous to balance sheets, income statements, statements of changes in overall financial position, or income and debt statements that present the debtor or insider's net worth, overall financial health, or equation of assets and liabilities." *Barnes v. Belice (In re Belice)*, 461 B.R. 564, 578 (B.A.P. 9th Cir. 2011) (quoting *Cadwell v. Joelson (In re Joelson)*, 427 F.3d 700, 714 (10th Cir. 2005)). A misrepresentation that does not pertain to financial condition may more appropriately give rise to a § 523(a)(2)(A) claim. However, oral misrepresentations regarding financial condition are not grounds for nondischargeability. *In re Belice*, 461 B.R. at 573.

Paik testified that Lee provided him with SNC's balance sheet and income statement as of June 30, 2005. Both documents present a picture of SNC's overall financial health. The balance sheet indicated that SNC had total assets of $14,503,990.78, with over $13 million of the funds listed as being in a "FX Trading Acct". This was a material misrepresentation, as it is an admitted fact that little or none of the SNC investors' money was traded. Similarly, the income statement claims revenues of $3,401,163.11 for "Trading". As with the balance sheet, the income statement misrepresented that the company was wholly engaged in Forex trading and that substantial funds were coming into the company from the trading. That representation was material, as it created an illusion of SNC's legitimacy and profitability. Lee's admitted role as a director of SNC makes SNC his insider for purposes of § 523(a)(2)(B).

The circumstances support Paik's argument that Lee possessed the requisite knowledge of falsity and intention to deceive. His testimony regarding his belief that SNC was involved Forex trading was weak – in essence he suggested that he was satisfied that SNC's trading activities were legitimate because he saw graphs on computer screens during his visits to the San Francisco corporate office. In reality, he was highly involved with SNC's principals and either knew about the fraudulent nature of the scheme or was recklessly indifferent to the facts available to him.

Paik justifiably relied on the information in the income statement and balance sheet in deciding to invest in SNC. Nothing in those documents raised red flags; they were consistent with Lee's representations about the profitability of the company and its investments in the Forex market. As a result of the misrepresentations, Paik incurred damages in the amount of $615,777.47, subject to reduction as set forth above.

In light of the foregoing, Paik's § 523(a)(2)(B) claim is granted with respect to Ken Lee, with damages in the amount of $315,777.47.

### 3. Nondischargeability under 11 U.S.C. § 523(a)(19)

Section 523(a)(19) provides, in pertinent part, for dischargeability of a debt that is for the violation of securities laws or fraud, deceit, or manipulation in connection with the purchase of sale of any security, and that results from any settlement agreement entered into by the debtor.

"Section 523(a)(19) allows a court in appropriate circumstances to base a finding of securities violations on the debtor's entry into [a] settlement agreement." *Mollasgo v. Tills (In re Tills)*, 419 B.R. 444, 452 (Bankr. S.D.Cal. 2009). In *Tills*, the bankruptcy court considered whether the debtor should be precluded from contesting liability for settled claims of securities violations notwithstanding language in the settlement agreement indicating that fault or liability were not conceded. *Id.* at 453. In considering whether issue preclusion applied, the court reviewed cases applying the legislative history behind § 523(a)(19) and the analogous provision § 523(a)(11).[7]

Application of issue preclusion requires a prior determination that: (1) resolved an identical issue; (2) actually litigated the identical issue; (3) necessarily decided the identical issue; (4) is final and resolved the issue on its merits; and (5) occurred between parties in privity to one another, in the former proceeding. *Khaligh v. Hadaegh (In re Khaligh)*, 338

---

[7] Section 523(a)(11) makes nondischargeable any debt provided in a settlement agreement arising from fraud or defalcation while acting in a fiduciary capacity committed with respect to a depository institution or insured credit union

B.R. 817, 824 (B.A.P. 9th Cir. 2006). Additionally, the Court must consider whether preclusion would be fair and consistent with public policy in light of the circumstances of each case. *Id.* at 824–25. As explained in *Tills*, "[i]n section 523(a)(19), Congress clearly intended to alter the 'actually litigated' requirement [of the issue preclusion analysis] so that a settlement agreement has a preclusive effect not otherwise available." *Tills*, 419 B.R. at 453. However, while the issue of whether a debt is for the violation of securities laws need not have been "actually litigated," it must have been "necessarily decided" for issue preclusion to apply. *See id.* at 454.

Paik alleges that the parties settled after the state court determined that Paik's notes were ruled to be "securities." In support of his § 523(a)(19) argument, Paik requests that the court take judicial notice of the state court's November 26, 2012 order granting summary adjudication on his "first, second and third causes of action" and determining that the promissory note issued to him by SNC is a "security" for purposes of 18 U.S.C. § 1964(c). In 2012, Cal. Civ. Proc. Code § 437c(s)(1) provided that "a party may move for summary adjudication of a legal issue or a claim for damages other than punitive damages that does not completely dispose of a cause of action, an affirmative defense, or an issue of duty." Cal. Civ. Proc. Code § 437c (west) (effective January 1, 2012 to December 31, 2014). According to Paik, the parties settled based on the state court's determination.

While the state court's summary adjudication order apparently ruled on the issue of whether Paik's loan is a security, among other issues, the evidence does not show that the settlement agreement between the parties "necessarily decided" whether the debt is for the violation of securities laws. In other words, Paik has not proven that the parties settled based on a violation of securities laws or based on some other alleged wrongdoing. It appears that the settlement agreement was never reduced to writing and any information placed on the record in the state court proceeding has not been provided to the court. To the extent the settlement was based on the state court's summary adjudication, it is unclear whether it was based on the first, second or third causes of action—or what the legal bases of those causes of action were. Even assuming the settlement was based in part on securities violations, the

court cannot determine how the parties contemplated apportionment of damages among the causes of action.

Issue preclusion is thus inapplicable for purposes of § 523(a)(19) and Paik has not otherwise proven by a preponderance of the evidence that the parties settled based on a violation of securities laws or based on some other alleged wrongdoing. As such, Paik's § 523(a)(19) claim is denied.

### 4. Denial of Discharge under 11 U.S.C. § 727(a)(3)

Section 727(a)(3) provides for denial of discharge where, among other things, a debtor failed to keep or preserve any recorded information from which his financial condition or business transactions might be ascertained. The underlying purpose of this subsection is "to make discharge dependent on the debtor's true presentation of his financial affairs." *Caneva v. Sun Communities Operating Ltd. P'ship (In re Caneva)*, 550 F.3d 755, 761 (9th Cir. 2008). Even so, § 727(a)(3) "does not require absolute completeness in making or keeping records." *Id.* Instead, a debtor must only "present sufficient written evidence which will enable his creditors reasonably to ascertain his present financial condition and to follow his business transactions for a reasonable period in the past." *Id.* A debtor's "duty to keep records is measured by what is necessary to ascertain [his] financial status." *Moffett v. Union Bank*, 378 F.2d 10, 11 (9th Cir. 1967); *see also U.S. Trustee v. Hong Minh Tran (In re Hong Minh Tran)*, 464 B.R. 885, 893 (Bankr. S.D.Cal. 2012) (type of debtor, as well as debtor's sophistication, informs the bankruptcy court's determination).

Paik points to a $1.3 million discrepancy between the amount the Lees earned between 2004 and 2008—as evidenced by checks issued by SNC—and the amount the Lees reported to the IRS during that time period—as evidenced by the Lee's W-2 from SNC and the 1099s issued by SNC to Cal-Tech.[8] However, Paik offers no evidence that the Lees failed to

---

[8] At trial, Lee asserted – apparently for the first time – that the difference relates to Cal-Tech's investment in SNC on behalf of a Korean company, Eun Sook. As a determination of this issue is not necessary to the court's ultimate finding, the court makes no determination as to whether this properly accounts for the difference or not.

maintain complete and accurate records for at least four years prepetition. In light of their level of sophistication, the court finds that the Lees provided sufficient information for creditors and the court to reasonably ascertain their financial status for purposes of their chapter 7 case.

Further, as to Hyun Lee, it is clear that she did not fully understand the nature of Lee's involvement with SNC or the particulars of his source of income. The couple had developed a clear division such that Hyun Lee relied on Lee to earn income and maintain proper business records. Under such circumstances, the "spouse who has delegated the responsibility for maintaining the financial records need not inquire about those records absent some reason to be suspicious that they are not being kept properly." *Lansdowne v. Cox (In re Cox)*, 41 F.3d 1294, 1299 (9th Cir. 1994). Hyun Lee, having no reason to be suspicious of her husband's recordkeeping that the court is aware of, would not be denied a discharge under § 727(a)(3) even if the court were to find the information provided by the Lees insufficient.

For the foregoing reasons, Paik's § 727(a)(3) claim is denied.

### 5. Denial of Discharge under 11 U.S.C. § 727(a)(4)(A)

Bankruptcy Code § 727(a)(4)(A) provides in pertinent part that "The court shall grant the debtor a discharge unless ... the debtor knowingly and fraudulently, in or in connection with the case—(A) made a false oath or account ..." This court may deny a Chapter 7 debtor's discharge if (1) the debtor made a false oath in connection with the case; (2) the oath related to a material fact; (3) this oath was made knowingly; and (4) the oath was made fraudulently. Paik must establish these elements by a preponderance of the evidence. *Retz v. Samson (In re Retz)*, 606 F.3d 1189, 1197 (9th Cir. 2010) (citing *Roberts v. Erhard (In re Roberts)*, 331 B.R. 876, 882 (B.A.P. 9th Cir. 2005)).

A false oath may involve an affirmatively false statement or an omission from a debtor's bankruptcy schedules or statement of financial affairs. *Searle v. Riley (In re Searle)*, 317 B.R. 368, 377 (B.A.P. 9th Cir. 2004) (citations omitted), aff'd, 212 Fed. Appx. 589 (9th Cir. 2006). A material fact is one that "bears a relationship to the debtor's business

transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property." *In re Khalil*, 379 B.R. at 173. Notwithstanding this broad definition, a "false statement or omission that has no impact on the bankruptcy case is not material and does not provide grounds for relief for denial of a discharge under § 727(a)(4). *Id.* at 172. An act is done "knowingly" when the debtor acts "deliberately or consciously." *Id.* at 173. A fraudulent oath or omission is made fraudulently when the (1) debtor makes a misrepresentation or an omission; (2) that at the time he or she knew was false; and (3) with the intention and purpose of deceiving creditors. *Id.* Courts typically rely on circumstantial evidence to demonstrate this intent. *Devers v. Bank of Sheridan, Montana (In re Devers)*, 759 F.2d 751, 753–54 (9th Cir. 1985). Recklessness alone does not establish a debtor's fraudulent intent. It can, however, form a part of the circumstantial evidence typically used to establish fraudulent intent. *In re Khalil*, 379 B.R. at 173.

Paik alleges that the Lees improperly listed Chris Lee as a creditor in their Schedule F of their bankruptcy petition. He further alleges that the Lees intentionally omitted from their bankruptcy schedules investments in a gas station and other investments.

Chris Lee testified at trial that Lee's obligation to him arises out of a guaranty and promissory note executed in 2008. Paik argues that the Lees should not have scheduled the alleged debt because the relevant statute of limitations bars recovery on the debt. The Lees assert that they scheduled Chris Lee's debt out of caution. The expiration of the statutory period within which an action can be commenced does not extinguish the debtor's obligation under California law. *Mitchell v. Cnty. Sanitation Dist. No. One of Los Angeles Cnty.*, 150 Cal. App. 2d 366, 370 (1957). Instead, the statute of limitations must be raised as an affirmative defense. Due to the broad definition of a "claim" in § 101(5) of the Bankruptcy Code, debtors routinely schedule claims that may be time-barred or otherwise potentially unenforceable. The Lees' act of scheduling Chris Lee as a creditor in the case was consistent with bankruptcy practice regularly before this court and does not constitute a knowing and fraudulent false oath.

The argument that the Lees failed to include their interest in a gas station or other investments in their schedules is unsupported by the evidence presented at trial. In support of this argument, Paik provided Federal income tax returns for Cal-Tech—a separate legal entity from the debtors—from 2005 through 2007. The returns include a schedule of assets listing an "Investment" and "Investment in Gas Station" totaling between $240,000 and $290,000 during that period. While "it is good practice for the assets of a debtor's solely owned corporation … to appear on that debtor's individual bankruptcy schedules …, where the existence of the corporation itself is clearly disclosed on the schedules, the Court cannot find fraud in the omission of individual assets belonging, not to the Debtor, but to the Debtor's corporation." *BTE Concrete Formwork, LLC v. Arbaney (In re Arbaney)*, 345 B.R. 293, 310 (Bankr. D.Colo. 2006). The evidence submitted does not support a finding that the Lees owned any interest in the gas station on the petition date. Moreover, the Lees disclosed in their Statement of Financial Affairs that they had an interest in Cal-Tech from 2003 to 2009. This is consistent with Lee's trial testimony.

For the foregoing reasons, Paik's § 727(a)(4)(A) claim is denied.

### 6. Hyun Lee's Liability

Paik asserts that Lee's conduct resulting in an exception to discharge should be attributed to Hyun Lee as well. "Marriage alone is not sufficient to impute fraud from one spouse to another. A business partnership between a debtor and spouse for denial of discharge purposes exists where "the debtor assumed an active role in the [spouse's business] that goes beyond merely holding a community property interest in [the spouse's] business and performing minor services in that business." *Tsurukawa v. Nikon Precision, Inc. (In re Tsurukawa)*, 287 B.R. 515, 521 (B.A.P. 9th Cir. 2002). Fraud may be imputed to a spouse under agency/partnership principles in a § 523(a)(2)(A) action, if the spouses are also business partners. *Id.* at 525. However, while the debtor need not have participated actively in the fraud for the creditor to obtain an exception to discharge, the creditor must show that

the debtor knew, or should have known, of the agent's fraud. *Sachan v. Huh (In re Huh)*, 506 B.R. 257, 271-72 (B.A.P. 9th Cir. 2014).

Paik asserts that liability should be established based upon Hyun Lee's employment by Cal-Tech during the relevant period and their joint tax returns listing her occupation as a corporate officer. Hyun Lee testified that she answered the phones at Cal-Tech and provided some general office support. She testified that she never spoke with investors and indicated that she was unfamiliar with her husband's responsibilities at SNC. The court finds Hyun Lee's testimony as to her involvement with Cal-Tech credible. Further, the court finds Hyun Lee's testimony that she was not involved in preparation of the tax returns and did not review them credible. This testimony is supported by the testimony of the Lees' accountant, Jong Suk Sohn, that in his 17 years of preparing tax returns for the Lees he never met Hyun Lee. The court finds that Hyun Lee activity at Cal-Tech does not rise to the level of a business partnership and that she was unaware of her husband's conduct. Thus, there is no basis to impute her husband's fraud to Hyun Lee.[9]

Paik is requested to submit a judgment consistent with this decision.

***END OF MEMORANDUM DECISION***

---

[9] Paik erroneously asserts that the failure to except the discharge as to Hyun Lee will prevent him from being able to collect his judgment against the Lees' post-petition community property. Paik can still reach Lee's separate and community property to satisfy his nondischargeable judgment against Lee. As a leading bankruptcy treatise concludes, "Congress made a policy decision 'that the economic sins of either spouse would be forever visited upon the community property of the spouses' (including after acquired community property) when it enacted 11 U.S.C. §§ 524(a)(3) and 524(b)(1)(A) and (B)." *Sophos v. Hibbs (In re Hibbs)*, 161 B.R. 259, 269-70 (Bankr. C.D. Cal. 1993) (quoting 3 Collier on Bankruptcy § 524.01 (King 15th ed. 1983)), *aff'd*, 122 F.3d 1071 (9th Cir. 1997).

**COURT SERVICE LIST**

<u>Via ECF:</u>

All ECF Recipients